**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Luque,<br><br>        Plaintiff,<br><br>v.<br><br>Antony J. Blinken,[1]<br><br>        Defendant. | No. CV-19-00330-TUC-JGZ (LAB)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Victor Jesus Luque applied for a United States passport in February 2018. His application was denied in September 2018, on the ground that Victor was not a U.S. citizen. In this action, Victor challenges that conclusion. Victor asserts that he acquired the citizenship of his mother, pursuant to 8 U.S.C. § 1409(c), which provides:

> [A] person born, after December 23, 1952, outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

8 U.S.C. § 1409(c). The parties agree that Victor meets all of the requirements of section 1409(c), except the requirement that his mother, Bertha Luque, be physically present in the United States for a continuous one-year period prior to Victor's birth. Pursuant to 8

---

[1] Pursuant to Fed. R. Civ. P. 25(d), United States Secretary of State Antony J. Blinken is substituted in place of Defendant Michael R. Pompeo.

U.S.C. § 1503(a) and 28 U.S.C. § 2201, Victor seeks a declaratory judgment that he is a citizen of the United States and is entitled to all the rights and privileges of citizenship including the right to possess a United States passport. (Doc. 1.)

At a trial to the Court, Plaintiff presented the testimony of his mother, Bertha Luque; Bertha's first cousin and sister-in-law, Armida Altamirano; and Bertha's cousin, Maria del Rosario Luque Diaz.[2] Plaintiff also testified on his own behalf. The parties agreed to the admission of photos and declarations which had also been submitted in support of Victor's passport application.

Plaintiff argues that evidence shows that Bertha was continuously present in the United States from shortly after birth to age two when she moved to Nogales, Sonora, Mexico, and also present in the United States continuously from ages 13 to age 18 when she worked for her Uncle Jose and Aunt Adela Lopez in Nogales, Arizona.

The Government argues that competent evidence of Bertha's presence in the United States after her birth is lacking and that Bertha's presence in the United States from age 13 to 18 was not continuous.

Pursuant to Fed. R. Civ. P. 52(a), upon reviewing all matters of record, considering the testimony at trial, weighing the credibility of the witnesses, and examining all exhibits, the Court makes the following findings of fact and conclusions of law. To the extent these findings of facts are also deemed conclusions of law, or conclusions of law include findings of fact, they are hereby designated as such.

**I.     Findings of Fact**

**A.     Bertha Luque's testimony about her presence in the United States after her birth**

Bertha was born on December 15, 1954 in Nogales, Sonora, Mexico, to Irene Soto and Teodoro Luque. (Doc. 68, pp. 15-16, 22-23.) Bertha testified that when she was born, her mother was living in Nogales, Sonora. (*Id.*, p. 23.) Bertha was 65 years old in

---

[2] The trial transcripts are filed on the docket as Docs. 68, 69, and 70. The Court will refer to the docket number when citing the testimony.

- 2 -

September 2020 when she testified in this case. (Doc. 68, p. 15.) Her testimony about her living arrangements after her birth was inconsistent and sparse.

On direct examination, Bertha testified that after she was born, she lived with her mother and father for the first two to three years in Nogales.[3] (*Id.*)

Bertha testified that she lived with her mother from age three forward, but when asked to confirm this, testified that she lived with her mother from age one to age 13. (*Id.*, p. 23.)

Bertha also testified that she attended school in Nogales, Sonora, Mexico, starting first grade when she was about 7 years old, through sixth grade, when she was 11 years old. (*Id.*, pp. 23-24.) She testified that she was living with her father in Nogales, Sonora, at that time. (*Id.*, pp. 24-26.) Then her mother came for her and she went with her mother to the United States. (*Id.*, pp. 25-26.)

Finally, Bertha was questioned about her affidavit which gave different information, and testified that she lived with her mother in Tucson for five years after she was born. (*Id.*, p. 26.) Bertha explained that this was what her mother had told her. (*Id.*)

As to the photographic evidence, Bertha testified that Exhibit 1A was a photograph of herself at age one when she was with her mother in Tucson, Arizona. (*Id.*, p. 19.) She explained that she remembered seeing the picture long ago at the house of her stepmother, Teresa, and that Bertha's sister told Bertha that it was Bertha in the photo. (*Id.*, pp. 43-44.) Bertha also testified that she knew that the photo was taken in Tucson because her stepmother took the photo. (*Id.*, p. 43.) However, Bertha acknowledged on cross-examination that her stepmother lived in Nogales, Sonora. (*Id.*, p. 44.) There was

---

[3] Bertha did not distinguish between Nogales, Sonora and Nogales, Arizona. The Court concludes that during this testimony Bertha meant that she lived in Nogales, Sonora, with her parents because she was born in Mexico, her parents lived in Mexico at the time of her birth, and there is no evidence that Bertha's father ever lived in the United States.

- 3 -

no testimony that Teresa ever traveled to the United States, either to Nogales Arizona or Tucson Arizona.

Bertha testified that Exhibit 1B was a photograph of herself when she was around age nine, standing on a hill along with her father Teodoro, her Aunt Adela and Adela's mother, Dolores. (*Id.*, pp. 20-21, 45.) She testified that the photo was taken in Nogales, Arizona. (*Id.*, p. 21.) Bertha did not know who had taken the photo and did not recall the event. (*Id.*, p. 47.) She believed that it was taken in Nogales, Arizona, because there was a little hill close to her aunt's house like that in the picture. (*Id.*) When Bertha was a teenager, Dolores lived in Nogales, Sonora, with one of her daughters. (*Id.*, pp. 47-48.)

**B.     Bertha's testimony about her presence in the United States from ages 13 to 18, and thereafter**

Bertha testified that from ages 13 to 18, she lived with her Aunt Adela and Uncle Jose Lopez in Nogales, Arizona. (*Id.*, p. 27.) She stayed with them to care for their children, but was not paid. (*Id.*, pp. 29, 31-32.) She ate her meals and slept at their house in a room she shared with the female children. (*Id.*, pp. 29, 48.) She testified that she would visit her mother in Tucson on the weekends, and once in a while she would visit her father in Mexico. (*Id.*, pp. 29-31.) Bertha testified that Exhibit 1C was a photograph of herself at age 13 when she was living with her Aunt Adela. (*Id.*, p. 21.)

Bertha's father, Teodoro, was married to Teresa, and they had a daughter, Rosalia, also born in 1954, the same year Bertha was born. (*Id.*, pp. 31, 49.) When Bertha visited her father in Mexico, she would share a bedroom with Rosalia. (*Id.*, pp. 48-49.)

On cross-examination, Bertha acknowledged that at her deposition six months earlier, she had testified that every weekend or every two weeks, her mother would pick her up at her Aunt Adela's house and take her to her parents' house in Mexico, and later pick her up from her parents' house and take her back to her aunt's house in Nogales, Arizona. (*Id.*, p. 57.) She had also previously testified that she was only living with her Aunt Adela during the week while her aunt was working. (Id., pp. 58-59.) On the weekend, she would go home to her parents' house. (*Id.*, p. 59.) Bertha also testified

during cross-examination, that when her mother brought her across the border into the United States, the authorities would look at her mother's paper, say "U.S. citizen," and let them enter. (*Id.*, p. 50.)

On re-direct, Bertha testified that her mother Irene never took her to Mexico. (*Id.*, p. 60.) She visited with her mother in Tucson on the weekends, and once in a while visited with her stepmother Teresa and her father in Nogales, Sonora. (*Id.*, pp. 60-61.) When she visited her father and stepmother in Sonora, her mother would get her back across the border by declaring Bertha to be a U.S. citizen. (*Id.*, p. 61.) Bertha always crossed back into the United States with her mother, Irene. (*Id.*)

When Bertha was 18 years old, she met Ramon Luque, and they moved to Guaymas, Sonora, Mexico. (*Id.*, p. 32.) A short time later Victor was born of this relationship in Guaymas. (*Id.*, p. 33.) Bertha and Ramon were not married at the time of Victor's birth. (*Id.*, pp. 33-34.)

Bertha and Ramon had several other children together. (*Id.*, pp. 33; *see also* Exs. 7, 12-14.) Bertha moved to California in approximately 1975. (*Id.*, p. 33.) Bertha and Ramon married in 1983. (*Id.*)

Bertha testified that in 1984, she received a United States certificate of citizenship. (*Id.*, p. 22.)

### C. Victor Luque's testimony

Victor Luque was not able to provide much information about his mother's presence in the United States prior to his birth.

Victor was born on May 21, 1973, in Guaymas, Sonora, Mexico. (Doc. 69, p. 9, 21.) He is a cabinetmaker. (*Id.*, p. 9.) He moved to Tucson, Arizona, with his family when he was five years old, and attended elementary school in Tucson starting at age five. (*Id.*, p. 10.) When Victor and his mother came to live in the United States, neither had been recognized as a United States citizen. (*Id.*, p. 23.) As a child he would travel to Mexico with his mother, Bertha. (*Id.*, p. 10.) When reentering the United States, he would claim U.S. citizenship and he was permitted to enter, until 2000. (*Id.*, pp. 10-11.)

Then agents told him that they knew he was not a citizen. (*Id.,* p. 11.) The agents sent Victor back to Mexico and told him to go to the U.S. Consulate in Hermosillo to get his paperwork fixed so he could legally cross the border. (*Id.*, pp. 11, 18)

About three years ago, Victor filed an application for a United States passport. (*Id.*, p. 11.) According to Victor, the application was denied because he could not prove that his mother had been in the United States before he was born. (*Id.*) In support of his passport application, Victor provided affidavits from his mother, Dolores Lopez de Mendoza, Guadalupe Lopez Armenta, and Armida Luque Altamirano. (*Id.*, pp. 11-12; *see also* Ex. 34.[4])

Bertha accompanied Victor when he applied for the passport and officials asked her if she could prove that she had been in the United States for one-year prior to Victor's birth. (*Id.*, p. 13.) She showed them her certificate of U.S. citizenship. (*Id.*)

Victor looked for additional information to support his claim about his mother's presence in the United States, but was unable to find additional information, through the census bureau or otherwise, although he did find records pertaining to his grandmother. (*Id.*, pp. 13-14.) Victor has no personal knowledge of where his mother lived prior to his birth. (*Id.*, p. 31.)

Victor testified that in 1991, he also attempted to obtain citizenship through his wife Cynthia, but the request was denied because he did not have proof showing the reason he was detained on an earlier occasion. (*Id.*, pp. 18-19.)

Victor related that his mother, Bertha, and his father, Ramon, were married in 1983. (*Id.*, p. 24.) Ramon lived with Victor's family in California when they moved there. (*Id.*) Ramon was not a United States citizen. (*Id.*)

Victor testified that his mother obtained a certificate of United States citizenship in 1983 or 1984 and that the certificate of citizenship admitted as Exhibit 5 is a duplicate.

---

[4] Victor also testified that he submitted an affidavit from Blanca Ofelia Lopez in support of his passport application. (Doc. 69, p. 12.) Blanca's affidavit is not included among the exhibits admitted at trial.

(*Id.*, pp. 22-23.) Victor explained that Bertha lost the original certificate of citizenship, and that Exhibit 5, which is dated 1989, is the replacement. (*Id.*)

Victor testified that his father, his maternal grandmother, and Bertha's Aunt Adela are deceased. (*Id.*, pp. 21, 24, 27.)

### D. Testimony of Armida Luque Altamarino

Armida Altamarino's testimony was sparse on details about Bertha's presence in the United States. Armida was born in March 1956 and was 64 years old when she testified at trial. (Doc. 70, pp. 5, 9). She resides in Los Angeles, California. (*Id.*, p. 5.) She is Bertha's first cousin and also her sister-in-law because Bertha married Armida's brother, Ramon, and Armida's father and Bertha's father are brothers. (*Id.*, pp. 5, 18-19.) Bertha is two years older than Armida. (*Id.*, pp. 23-24.)

As a child, Armida lived in Guaymas, Sonora, Mexico. (*Id.*, pp. 5-6.) She visited the home where Bertha lived in Nogales, Sonora, during the summers in the 1960s through the 1970's. (*Id.*, pp. 6, 9.) From 1962 to 1967, when Armida was between the ages of six and 11 years, Bertha was at the home in Nogales, Sonora. (*Id.*) Armida would come to Nogales with her parents and stay the entire summer. (*Id.*, p. 7.) Armida testified that after 1967, she no longer saw Bertha in Nogales, Sonora, because Bertha was with Ramon in Guaymas. (*Id.*) This testimony is inconsistent with Bertha's testimony that she went to Guaymas at age 18, which would have been no earlier than December 1972. It is also inconsistent with Armida's later testimony that Bertha went to Guaymas in 1972, which appears more likely.

Armida knows that at some point Bertha lived in the United States with the Lopez family, but Armida does not know when. (*Id.*) Armida also testified that during the time that Bertha was with the Lopez family, she did not see Bertha in Nogales, Sonora. (*Id.*, pp. 7-8.)

Armida's brother Ramon did not travel with their family to Nogales, Sonora, during the summer trips, but Ramon went to Nogales, Sonora, at age 16. (*Id.*, pp 11-12.) Armida believes that Ramon and Bertha met when they were 16 in Nogales, Sonora, and

that Bertha was living in Nogales, Arizona, at that time. (*Id.*, pp. 11-13.) Ramon crossed into the United States illegally sometime between ages 16 and 18. (*Id.*, p. 24.) In 1972, when Bertha was approximately 18, Bertha and Ramon returned together to Guaymas. (*Id.*, pp. 13, 25.) Ramon and Bertha were married in Guaymas. (*Id.*, p. 25.) Armida does not know where Bertha was living when Ramon eloped with Bertha. (*Id.*, pp. 24-26.)

Armida met Irene Soto, Bertha's mother, for the first time when Armida was 18. (*Id.*, pp. 19, 24.) Bertha was already living with Ramon in Guaymas at that time. (*Id.*, p. 24.) Armida saw Irene several times after that, always in Nogales, Sonora, Mexico. (*Id.*, p. 19.) Irene had family living there. (*Id.*, p. 21) Bertha's stepmother lived in Nogales, and Irene would visit the family. (*Id.*)

On cross-examination, Armida was questioned about her affidavit statement, submitted with Victor's passport application, that: "All my life it was widely known that Bertha's mother, Irene Soto, was a citizen of the United States, whose parents were Americans and whose father was a Native American." (*Id.*, pp. 19-21.) Armida testified that she meant that Irene's family, which was a big family, knew this. (*Id.*, p. 21.)

At some point Irene Soto disappeared from Bertha's life. (*Id.*, p. 22.) Armida does not know exactly when that occurred. (*Id.*)

### E. Testimony of Maria del Rosario Luque Diaz

Like Armida, Maria del Rosario Luque Diaz was unable to provide much detail about Bertha's presence in the United States. Maria was 60 years when she testified at trial. (Doc. 70, p. 28.) She lives in Guaymas, Sonora. (*Id.*) She is Armida's sister, and a first cousin to Bertha. (*Id.*, pp. 28-29, 31-33.) She is six years younger than Bertha. (*Id.*, p. 31.) As a child, from 1962-1968, every summer she visited Bertha's family in Nogales, Sonora. (*Id.*, p. 29.) Maria was two to eight years old during that time period. (*Id.*, pp. 31.) She did not see Bertha during the visits because Bertha was living with the Lopez family in Arizona. (*Id.*, pp. 29-30.) She knows this because her aunt and uncle would chat about it. (*Id.*, p. 30.)

Maria never visited Bertha in the United States. (*Id.*) Maria next saw Bertha in 1972 when Bertha came to Guaymas with Ramon. (*Id.*, p. 33.) Maria never met Bertha's mother, Irene Soto. (*Id.*)

**F.     Affidavits of Dolores Lopez de Mendoza and Guadalupe Lopez Armenta**

Dolores Lopez de Mendoza was born in Naco, Sonora, Mexico. (Ex. 34, p. DEF-USA-1-027[5] at ¶ 2.) Dolores resided in the United States beginning in 1957. (*Id.*, ¶ 4.) In 1966, she became a U.S. Citizen. (*Id.*)

Guadalupe Lopez Armenta was born in Nogales, Arizona. (Ex. 34, p. 1-019 at ¶ 2). Dolores and Guadalupe are sisters and their parents were Bertha's Uncle Jose and Aunt Adela.[6] (Ex. 34, p. 1-027, at ¶¶ 3, 6; Ex. 34, p. 1-019 at ¶¶ 3,6.) Beginning in 1960 Bertha lived with their parents for temporary periods. (Ex. 34, p. 1-027 at ¶ 7; Ex. 34, p. 1-019, at ¶ 7.) In 1968, Bertha moved in with their family and remained with them for approximately four or five years. (Ex. 34, p. 1-027 at ¶ 7; Ex. 34, p. 1-019 at ¶ 7.) Bertha lived with the family to care for Dolores and Guadalupe's younger siblings. (Ex. 34, p. 1-027 at ¶ 8; Ex. 34, p. 1-019, at ¶ 8.) In their affidavits, Dolores and Guadalupe stated that everyone in the family knew that Bertha's mother had been born in the United States and that Bertha visited and stayed with her mother for extended periods of time. (Ex. 34, p. 1-027 at ¶ 9; Ex. 34, p. 1-019, ¶ 9.)

**II.     Conclusions of Law**

**A.     Applicable Law**

Title 8 U.S.C. § 1503(a) allows any person who is within the United States who claims a right or privilege as a national of the United States and is denied such right or

---

[5] Citations to page numbers of Exhibit 34 refer to the Bates numbering at the bottom center of each page. For brevity, subsequent citations to Exhibit 34 will include only the last four digits.

[6] Bertha's Aunt Adela was the sister of Bertha's stepmother, Maria Teresa. (Ex. 34, p. 1-027 at ¶ 6; Ex. 34, p. 1-019 at ¶ 6.)

privilege on the basis of non-nationality, to file a declaratory judgment action for a de novo determination of his or her citizenship. In an action under 8 U.S.C. § 1503(a), the plaintiff bears the burden to establish United States citizenship by a preponderance of the evidence. *See Borunda v. Kerry*, No. CV 12-00396 WJ/WPL, 2015 WL 13658657, *6 (D.N.M. Aug. 11, 2015); *Garcia v. Clinton*, 915 F.Supp.2d 831, 833 (S.D. Tex. 2012); *see also Young Ah Chor v. Dulles*, 270 F.2d 338, 340-41 (9th Cir. 1959) ("The law is well settled that a person who seeks a judicial declaration of his citizenship under the Nationality Act of 1940 must establish his American citizenship by a fair preponderance of the evidence.") Thus, as applied here, Plaintiff is entitled to be recognized as a United States citizen if he can prove by a preponderance of evidence that his mother was physically present in the United States "for a continuous period of one year" prior to his birth, as required by 8 U.S.C.§ 1409(c).

Neither the Court nor the parties have identified a case interpreting the "continuous physical presence" requirement of 8 U.S.C. § 1409(c). However, the Supreme Court and the Ninth Circuit Court of Appeals have interpreted similar language in immigration statutes, and both courts have concluded that the language requires what it says: continuous, physical presence.

In *I.N.S. v. Phinpathya*, 464 U.S. 183 (1984), *superseded by statute,* the Supreme Court considered the meaning of "continuous physical presence" in 8 U.S.C. § 1254(a)(1), which permitted the Attorney General to exercise his discretion to suspend deportation and adjust the status of an otherwise deportable alien if the alien "has been physically present in the United States for a continuous period of not less than seven years." *Id.* at 185. Applying the principle of statutory interpretation that a statute must be interpreted by the ordinary meaning of its words, the Court found that the ordinary meaning of the words did not admit any exceptions to the continuous physical presence requirement. The Court reasoned that Congress deliberately omitted a moderating provision from the statutory language and noted that in instances when Congress intended for a continuous physical presence requirement to be flexibly administered, it provided

authority for doing so. *Id.* at 189-90. Thus, the Court concluded that Congress meant the "continuous physical presence" requirement to be administered as written, regardless of the severity of consequence. *Id.* at 190, 192. Applying this interpretation, the Court found that Phinpathya was ineligible for suspension from deportation. Phinpathya could not establish her "continuous physical presence" during the requisite seven-year period because she had been out of the United States for three months during that time period.

In 1986, Congress addressed the Supreme Court's holding in *Phinpathya* by amending section 1254 and inserting into the statute, moderating language providing that "'brief, casual, and innocent' absences during the seven-year period did not 'meaningfully interrupt the continuous physical presence.'" *Corro-Barragan v. Holder*, 718 F.3d 1174, 1178 (9th Cir. 2013) (citing Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 315(b), 100 Stat. 3359 (1986)); *see also* H.R. Rep. No. 3810, 99th Cong., 2d Sess. at 78, reprinted in 1986 U.S. Code Cong. & Admin. News 5649, 5682 ("This Amendment relaxes the residence requirement in the case of a 'brief, casual, and innocent' departure from the U.S."). Subsequently, Congress further changed the requirements of section 1254 by passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which repealed section 1254 and replaced it with 8 U.S.C. § 1229b to govern cancellation of removal and 8 U.S.C. § 1229c to govern voluntary departure. *Corro-Barragan*, 718 F.3d. at 1178 (noting that the IIRIRA "merged deportation and exclusion proceedings into a single process—a removal proceeding.") (footnote omitted). In place of section 1254's "'brief, casual, and innocent' standard, Congress added § 1229b(d), which precluded eligibility for cancellation of removal if the alien 'departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days' during a ten-year period immediately preceding application for cancellation of removal." *Id.* (quoting 8 U.S.C. § 1229(b)(d)(2)). Congress required that "[t]o be eligible for voluntary departure at the conclusion of removal proceedings under § 1229c(b), an alien now must have been '*physically present in the United States for a period of at least one year immediately*

*preceding the date the notice to appear was served.*'" *Id.* (quoting 8 U.S.C. § 1229c(b)(1)(A)) (emphasis added).

In *Corro-Barragan,* the Ninth Circuit interpreted section 1229c(b)'s requirement that an alien be "physically present in the United States for a period of at least one year," holding that one year of uninterrupted presence in the United States was required. 718 F.3d. at 1179-80. The court employed reasoning similar to that applied by the Supreme Court in *Phinpathya*, stating: "Congress explicitly set forth special rules for the treatment of certain breaks in physical presence under § 1229b, and yet no exceptions are provided for breaks in physical presence under § 1229c(b). Under the plain meaning of § 1229c(b), an alien must be physically present in the United States for at least one uninterrupted year to be statutorily eligible for voluntary departure at the conclusion of removal proceedings." *Id.* at 1179. As a result of its interpretation, the court held that Corro-Barragan was ineligible for relief in the form of voluntary departure under section 1229c(b) because she failed to establish that she had been in the United States for at least one uninterrupted year before being served with the notice to appear. *Id.* at 1180.

In interpreting the statute at issue in this case, the Court must start, as the Supreme Court instructed in *Phinpathya*, with the language employed by Congress, and the Court must assume that the ordinary meaning of that language accurately expresses the legislative purpose. *Phinpathya*, 464 U.S. at 189; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (collecting cases)). Here, as in *Phinpathya*, the ordinary meaning of the words requiring continuous physical presence in section 1409(c) is an uninterrupted physical presence. In other words, the statute requires that for Victor Luque to be recognized as a United States citizen, his mother had to have "previously been physically present in the United States or one of its outlying possessions for a ***continuous*** period of one year" prior to his birth. 8 U.S.C. § 1409(c) (emphasis added). Like sections 1254 and 1229c(b), section 1409(c) contains no moderating language or any exception to the requirement of continuous

presence. When the words of a statute are unambiguous, then judicial inquiry is complete. *Conn. Nat'l Bank*, 503 U.S. at 254 (citing *Rubin v. U.S.* 449 U.S. 424, 430 (1981)).

The Court cannot impute from the later amendment of section 1254 that Congress also meant for section 1409(c) to allow for such absences. Congress could have modified the "continuous physical presence" language in 8 U.S.C.§ 1409(c), as it did section 1254 after *Phinpathya.* Congress did not do so. "Congress designs the immigration laws, and it is up to Congress to temper the laws' rigidity if it so desires." *Phinpathya*, 464 U.S. at 196.

Plaintiff urges the Court to interpret section 1409(c)'s continuous physical presence requirement by reference to the definition of "residence," a term used in other citizenship statutes. (Doc. 54, pp. 3-5.) Plaintiff asserts under the test for residency, he need only show that the United States was Bertha's principal place of dwelling during the requisite period, and temporary absences would not interrupt the period of residency. (*Id.* at pp. 3-5.) Plaintiff notes INA 240A(b)(1), (d)(2),[7] codified at 8 U.S.C. § 1229b(b)(1),(d)(2), permits brief absences during the 10-year "continuous physical presence" required for cancellation of removal. (*Id.* at p. 5.) Finally, Plaintiff cites a former version of 8 U.S.C. § 1401 which allowed for brief absences in the continuous physical presence required by certain persons to retain derivative citizenship. (Doc. 54, p. 6 (citing Pub. L. No. 92-584, 86 Stat. 1289 (Oct. 27, 1972), repealed by Pub. L. No. 95-432, 92 Stat. 1046 (Oct. 10, 1978).)

Unlike these other citizenship statutes and 8 U.S.C. § 1229b, section 1409(c) does not use the term "residence," nor contain the moderating language included in 8 U.S.C. § 1229b(d)(2) and former 8 U.S.C. § 1401, both of which explicitly allowed for brief

//

//

---

[7] Plaintiff's citation to INA 240(A) is incorrect. The correct citation is 240A.

absences.[8] The absence of such language cuts against Plaintiff's argument. See *Corro-Barragan*, 718 F.3d at 1179-80 (noting that Congress provided breaks for certain absences under section 1229b(d) for cancellation of removal but set forth no exceptions for breaks in section 1229b(c) for voluntary departure and concluding that 1229b(c) therefore required uninterrupted presence in the United States). In light of the plain language in section 1409(c), the absence of moderating language, and the Supreme Court's interpretation of a similar "continuous physical presence" requirement, the Court presumes that Congress acted intentionally when it required a continuous physical presence in section 1409(c) and that a continuous physical presence means just that.

### B. Application

Considering the testimony and evidence admitted at trial under the applicable legal standards, the Court concludes that Plaintiff has failed to demonstrate by a preponderance of the evidence that his mother, Bertha Luque, lived in the United States continuously for one year prior to his birth, during her early childhood or her teenage years.

#### 1. Bertha's residency from infancy to age five

There is insufficient evidence that Bertha more likely than not was present in the United States for a continuous year during her early childhood. The primary evidence in support of that assertion consists of Bertha's statement that she was told she lived with her mother, Irene Soto, in Tucson for the first five years of her life. (Doc. 68, p. 26.) But Bertha also testified that she was born on December 15, 1954 in Nogales, Sonora, Mexico, where her mother was living at the time (Doc. 68, pp. 15, 22-23); she lived with her mother and father for her first two or three years in Nogales, Sonora (*id.*, p. 23); she lived with her mother from age three forward, but when asked to confirm, testified that she lived with her mother from age one to 13 (i*d.*); and she lived with her father in Nogales, Sonora, Mexico, from age seven through 11 while she attended school there. (*Id.*, pp. 23-24.)

---

[8] It is noteworthy that Plaintiff did not introduce evidence which would establish the length of Bertha's absences from the United States. Thus, even if the Court could conclude that section 1409(c) permitted brief absences, Plaintiff could not prevail.

- 14 -

These inconsistencies raise doubts as to the overall accuracy and credibility of Bertha's testimony. In addition, the Court notes that there is no evidence that Irene Soto lived in Tucson during the time periods that Bertha testified she lived with her mother.

Significantly, Bertha's testimony as to where she lived from birth to age five and the suggested inference that she was continuously in the United States during this five-year period, is not the kind of personal or family history admissible under either Rule 804(b)(4) or 803(19), Fed. R. Evid. *See Porter v. Quarantillo*, 722 F.3d 94 (2013) (concluding testimony as to the precise date of a toddler's relocation was inadmissible where the declarant fails satisfactorily to explain how the precise date of relocation was sufficiently significant or interesting or unusual such that it ever became a subject of presumptively accurate family lore); *see also Vega-Alvarado v. Holder*, No. CV 09-5591-RSWL (AJWx), 2011 WL 333101, *4-*5 (C.D. Cal. Jan. 28, 2011) (Rules 804(b)(4)(A) and 803(19) apply to statements concerning matters of pedigree such as marriage, time or place of birth or death, and paternity; they do not apply to statements regarding the background and circumstances of the declarant's time and work in the country). To the extent that Bertha's testimony about where she was told she lived is admissible, it is not persuasive, precisely because it is not the type of significant family history that would likely be the subject of family lore. Moreover, the testimony does not establish that Bertha remained in the United States continuously during this time period.

During closing argument, Plaintiff's counsel cited Armida's statement that it was widely known that Bertha lived with her mother for the first years of her life. (Doc. 70. p. 37.) Armida's statement also does not support Plaintiff's claim. Armida made this statement in her affidavit submitted with Victor's passport application. (*See* Ex. 34, p. 1-023, at ¶7 ("it was also widely known among the family that Bertha spent the first two or three years of her life in the State of Arizona with her mother, Irene.").) For the reasons stated above, this statement is not admissible under Rule 803(19). *See Porter*, 722 F.3d at 98-99; *Vega-Alvarado*, 2011 WL 333101, at *5. Nor is it persuasive. Armida's testimony is insufficient to support the conclusion that Bertha more likely than not

remained in the United States continuously during her early childhood. Importantly, at trial, Armida testified that she did not know specifically when Bertha stayed in the United States:

> Q. [Plaintiff's counsel]: And do you know if she lived ever in the United States?
> A. [Armida]: Yes, she was in the United States, but I do not know exactly when.

(Doc. 70, p. 7.)

### 2. Bertha Luque's residency during her teenage years

The Court further concludes that Plaintiff has failed to demonstrate by a preponderance of the evidence that his mother lived continuously in Nogales, Arizona, for one year sometime between age 13 and age 18. Although the evidence clearly shows that Bertha Luque spent at least five days of every week in Nogales, Arizona, caring for the children of her Aunt and Uncle Lopez, there is significant evidence that she routinely returned to Nogales, Sonora, on weekends to stay with her father and stepmother. (Doc. 68, pp. 27-31, 57-61.) In light of Bertha's prior deposition testimony that she returned to Mexico on the weekends to see her parents, and her acknowledgement during re-direct that she returned to Mexico at least "once in a while" without any more specifics, the Court concludes that Bertha's testimony does not provide a basis upon which to conclude that Bertha more likely than not remained in the United States continuously for one year while she cared for the Lopez children.

Significantly, none of the witnesses identified a one-year period of time in which Bertha remained continuously in the United States during the time she spent with the Lopez family. Additionally, none of the witnesses provided any specific details upon which the Court could conclude that it was more likely than not that Bertha remained in the United States continuously for one year prior to Victor's birth. Guadalupe Lopez Armenta's and Dolores Lopez de Mendoza's sworn statements that they knew that Bertha visited her mother and "stayed with her for extended periods of time" (presumably in the United States) do not provide information that would make it more likely than not that

Bertha continuously stayed in the United States for the requisite period. Neither Guadalupe nor Dolores provide specific day, months or years, or any basis from which the Court could determine that Bertha more likely than not remained continuously in the United States with her mother for one year. Further, Guadalupe's and Dolores's statements that Bertha stayed with their family for a number of years to care for their siblings do not provide any basis for rejecting Bertha's testimony that she returned to Mexico on the weekends to see her parents during that time period.

Similarly, testimony from Bertha's cousins, Armida Altamirano and Maria del Rosario Luque Diaz, provide no basis to support a finding in Plaintiff's favor. Although Armida testified that she did not see Bertha after Bertha went to live with the Lopez family, Armida also admitted that she did not know when Bertha was in the United States. Importantly, Armida and Maria testified they visited Bertha's family in Nogales, Sonora, only during the summertime. Their testimony sheds no light on Bertha's presence in Nogales, Sonora, during the other months of the year while she was caring for the Lopez children.

Finally, the photographic evidence submitted during trial provides little information as to Bertha's presence in the United States. Bertha testified that the photo of herself at age one was taken when she lived with her mother in Tucson, Arizona, and that the photos of herself at ages nine and 13 were also taken in Arizona. (Doc. 68, pp. 18-22, 43-47.) The evidence as to the origins of the photos and what they portray was inconsistent and inconclusive. For example, Bertha testified that the earliest photo was taken at her mother's house in Tucson by her stepmother (*Id*., pp. 43-44), but there was no evidence that her stepmother, who lived in Nogales, Sonora, had ever traveled to Tucson or into the United States. Similarly, there is little evidence that the photo of Bertha at age nine was taken in Nogales, Arizona. But even if the photos portrayed Bertha in the United States at various ages, the photos do not establish, by themselves or in combination with other evidence, that it is more likely than not that Bertha lived continuously in the United States for the requisite one-year period prior to Victor's birth.

**C.     Conclusion**

In order for Plaintiff Victor Luque to obtain a declaratory judgment that he is a United States citizen, Plaintiff was required to establish by a preponderance of the evidence that his mother, Bertha Luque, was physically present in the United States for a continuous period of one year prior to Plaintiff's birth in 1973.  8 U.S.C. § 1409(c). Considering the totality of the evidence presented at trial, the Court concludes that Plaintiff has failed to meet his burden.  The Court must therefore deny his request for declaratory relief.

For the foregoing reasons,

IT IS ORDERED that judgment shall be entered in favor of Defendant.

The Clerk of Court is directed to enter judgment accordingly and to close the file in this action.

Dated this 7th day of June, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge